IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


MARY E. GLOVER,                    )
                                   )
  individually and on behalf       )
  of other similarly situated      )
  former and current               )
  homeowners in Pennsylvania,      )
                                   )
              Plaintiffs,          )
                                   )   Civil Action No. 08-990
              v.                   )
                                   )
MARK J. UDREN, UDREN LAW           )
OFFICES, P.C., WELLS FARGO         )
HOME MORTGAGE, GOLDMAN SACHS       )
MORTGAGE COMPANY                   )
                                   )
              Defendants.          )


REPORT AND RECOMMENDATION


I. Recommendation

        Presently before the Court are Defendants, Mark Udren's

and Udren Law Offices, P.C.'s, (collectively, "Udren," unless

otherwise specified) motion to dismiss the second amended

complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a

claim upon which relief can be granted.  It is respectfully

recommended that the District Court dismiss with prejudice the

Fair Debt Collection Practices Act ("FDCPA") claim (counts

1

twelve and thirteen) and the Fair Credit Extension Uniformity Act ("FECUA"), claim (count fourteen) as to Udren Law Offices. It is also respectfully recommended that the motion to dismiss the Loan Interest Protection Law claim ("LIPL")(count sixteen), and the Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (count seventeen) claims be denied. Finally, it is recommended that the motion to dismiss the complaint (Doc. # 167) as to Mark Udren be granted with prejudice.

II. <u>Discussion</u>

A. <u>Facts and Procedural History</u>

On or about August 2, 2002, the Plaintiff, Mary Glover ("Glover"), entered into a mortgage loan transaction with Washington Mutual Bank ("WalMu"). In March 2005, Glover was injured in an automobile accident and suffered a loss of income. Glover contacted WalMu and requested a loan modification to reduce her monthly payments. Effective December 1, 2005, Glover entered into a Special Forbearance Agreement with WalMu. Under the terms of the Agreement, WalMu agreed to postpone certain of Glover's monthly payments and not to charge attorneys' fees. It also agreed to reevaluate Glover's request for financial assistance on April 1, 2006.

Prior to that time, however, on March 14, 2006, WalMu informed Glover by letter that her application for a loan work-out had been denied. Around that same time, Bill Murray, Esquire, an attorney with Udren Law Offices, telephoned Glover and informed her that she was required to pay eleven missed monthly payments and attorneys' fees and costs in an aggregate amount of $3,397.28. WalMu authorized Udren to file a foreclosure action against Glover and the mortgage foreclosure complaint was filed on April 10, 2006 in the Court of Common Pleas of Allegheny County. The amount due was calculated at $12,652.36.

Despite its earlier denial of a loan workout, on June 7, 2006, WalMu offered Glover a loan modification agreement. The letter accompanying the loan modification agreement informed Glover that her principal balance had increased by $2,237.73 - $806.45 for delinquent interest and $1431.19 for "Escrow/Advance/Set up. The letter then gave Glover conflicting directives concerning her responsibility to pay $3,696.00 in foreclosure fees and costs. In one sentence, the letter instructed Glover to remit a certified check in that amount to WalMu, but, a later sentence indicated the amount due as $0.00.

In any event, Glover did not pay the $3,696.00, nor did WalMu subsequently request payment.

In a letter dated November 15, 2006, WalMu informed Glover that the servicing of her mortgage loan, i.e., the right to collect payments, was being assigned, sold, or transferred to Wells Fargo Bank, N.A. ("Wells Fargo"). From that date on, Glover dealt with Wells Fargo concerning her mortgage payments, up to and including a loan modification agreement entered into on January 4, 2008. Glover made payments in accordance with the loan modification agreement.

On June 9, 2008, Glover commenced a putative class action in the Court of Common Pleas of Allegheny County alleging, *inter alia*, illegal lending and servicing practices against WalMu, Wells Fargo, and Udren. The case was removed to this jurisdiction and motions to dismiss were filed by Udren, WalMu, and Wells Fargo.

On October 23, 2008, the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver for WalMu,[1] filed a motion to substitute itself for WalMu as the real party in interest and requested a ninety-day stay of this action.

---

[1]     On September 25, 2008 the Office of Thrift Supervision appointed the FDIC as Receiver for WalMu.

This Court granted the motion on October 24, 2008.

After the termination of the ninety-day stay, on January 22, 2009, the FDIC again moved to stay the proceedings pending exhaustion of the mandatory administrative claims process.  On March 20, 2009, this Court filed a Memorandum and Order granting the stay.  After consideration of Glover's objections thereto, on June 15, 2009, the District Court concluded that the order granting the stay was not clearly erroneous or contrary to law and overruled Glover's objections.

On September 24, 2009, the FDIC denied Glover's claim, after which, on October 14, 2009, Glover filed an amended complaint.  The allegations against Udren included violations of the FCEUA, the LIPL, and the UTPCPL. The amended complaint also included a count alleging a violation of the FDCPA.

On November 12, 2009, Udren filed a motion to dismiss the amended complaint based upon a failure to state a claim under Fed. R. Civ. P. 12(b)(6).  On March 15, 2010, this Court filed a Report recommending that the FDCPA claim be dismissed with prejudice and that the state law claims be dismissed without prejudice to refile in state court.

On April 1, 2010, Glover filed objections to the

Report and Recommendation arguing, *inter alia*, that the Court erred when it recommended that the remaining state law claim should be dismissed without prejudice. Accordingly, on April 19, 2010, the March 15, 2010 Report and Recommendation was vacated in order to address the state law claims. Thereafter, on April 26, 2010, this Court conducted a status conference wherein counsel for Glover informed that he intended to file a second amended complaint to add a new party and deadlines to file this and other pleadings were established.

On June 3, 2010, a Revised Report was filed reviewing both the federal and state law claims and recommended that the motion be granted in part and denied in part. Despite the fact that the Report recommended that certain claims were to be dismissed with prejudice, Glover's second amended complaint, filed on June 9, 2010, in addition to adding Goldman Sachs Mortgage Company as a defendant, restyled the allegations of the counts for which dismissal with prejudice was previously recommended. Although this Court originally vacated the June 3, 2010 Report and Recommendation when the second amended complaint was filed, after objection from Udren, this Court reinstated the June 3, 2010 Report (Doc. # 115).

Both parties filed objections to the Report and Recommendation and, on August 18, 2010, the District Court entered an order dismissing the FDCPA and FCEUA counts without prejudice, dismissing the complaint against Mark Udren without prejudice, and denying the motion to respect to the LIPL and UTPCPL claims. The net effect of this Order was that the second amended complaint, filed on June 9, 2010, became the operative pleading.

On October 22, 2010, Udren filed a motion to dismiss the second amended complaint that is presently before the court.

B. <u>Standard of Review</u>

The United States Supreme Court opinions in <u>Bell Atlantic Corporation v. Twombly</u>, 550 U.S. 544 (2007) and, more recently, in <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937 (2009), have shifted pleading standards from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss. The Supreme Court outlined a two-part analysis that courts should utilize when deciding a motion to dismiss for failure to state a claim. First, the factual and legal elements of a claim should be separated. In other words, while courts must accept all of the complaint's well-pleaded facts as true, they may

disregard any legal conclusions. Second, courts then decide whether the facts alleged in the complaint are sufficient to demonstrate that the plaintiff has a "plausible claim for relief." <u>Iqbal</u>, 129 S. Ct. at 1950. A claim is facially plausible when the plaintiff pleads facts that permit a court to draw a reasonable inference that the defendant could be liable for the malfeasance alleged. <u>Id</u>. at 1949.

C. <u>Legal Claims</u>

`          1. <u>Fair Debt Collection Practices Act</u>

The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors . . .," <u>see</u> 15 U.S.C. § 1692(e), and "provides a remedy for consumers who have been subjected to abusive, deceptive, or unfair debt collection practices by debt collectors." <u>Pollice v. National Tax Funding, L.P.</u>, 225 F.3d 379, 400 (3d Cir. 2000).

In her second amended complaint, Glover contends that Udren violated the FDCPA by its failure to withdraw the foreclosure complaint filed in Allegheny County on April 10, 2006, even though the matter had been resolved on January 4, 2008, when she and Wells Fargo entered into a loan modification agreement. Glover contends that, as of the date of the loan modification agreement, the presence of the foreclosure

complaint on the docket of the Court of Common Pleas of Allegheny County equated to:  1) a false and continuing representation as the character, amount, or status of a debt in violation of 15 U.S.C. §1692e(2); 2) a representation or implication that nonpayment of a debt will result in a sale of property in violation of 15 U.S.C. §1692e(4); 3) a threat to take action that cannot legally be taken or not intended to  be taken in violation of 15 U.S.C. §1692e(5); 4) a communication to any person of knowingly false credit information in violation of 15 U.S.C. §1692e(8); and, 5) an unfair or unconscionable means to collect a debt, in violation of 15 U.S.C. §1692f.[2]

In its motion to dismiss, Udren argues that the FDCPA claims are time-barred and are without merit.

### a. Statute of Limitations

An FDCPA action must be brought within one year from the date the violation occurs.   15 U.S.C. 1692(k)(d); Schaffhauser v. Citibank (S.D.) N.A., 340 F. App'x 128, 130 (3d Cir. 2009).

Glover claims, and this Court agrees, that her FDCPA claim arose on January 4, 2008, when she and Wells Fargo agreed

---

[2]      Per Glover's request, the foreclosure lawsuit was discontinued on November 25, 2009.

to a loan modification, thus negating the effectiveness of the foreclosure complaint filed by Udren. As Glover did not raise the FDCPA count against Udren until October 14, 2009 when she filed her amended complaint, it would appear, facially, that the claim is time-barred.

Glover, however, posits that her claim is timely for two reasons – the FDCPA claim relates back to the Pennsylvania FCEUA claims raised in the original complaint filed on June 9, 2008, and that the FDCPA statute of limitations was tolled as a result of application of the Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA") and certain stays of the action entered by this Court.

Under Fed. R Civ. P. 15(c)(1)(B), an amendment to a pleading relates back to the date of the original complaint if it arises "out of the conduct, transaction, or occurrence set out - or attempted to be set out - in the original pleading."

Glover's original state court complaint included two counts for violations of the FCEUA, only one of which, count four, was brought against the defendant debt collectors. Court of Common Pleas of Allegheny County Compl., ¶¶ 107-113 (Doc. # 1, Ex. A). These paragraphs recite certain provisions of the FDCPA and allege that: 1) Wells Fargo erroneously demanded

payment from Glover in a December 9, 2006 letter; 2) Wells Fargo failed to identify itself as a debt collector in notices sent to Glover; and, 3) Wells Fargo acknowledged it its statements that many of Glover's monthly payments were not paid toward her unpaid principal balance, interest, or escrow account.

Review of the original pleadings reveals that the FDCPA violation pled against Udren in the October 14, 2009 amended complaint does not relate back to the FCEUA claims filed in the June 9, 2008 state court complaint. The FCEUA count against the defendant debt collectors, describing Wells Fargo's alleged deficiencies in its notices/letters to Glover, has absolutely no connection to the FDCPA allegation premised upon Udren's failure to discontinue the foreclosure proceeding pending against Glover in Allegheny County and clearly does not arise from either the same conduct, transaction, or occurrence. Indeed, the June 8, 2008 complaint does not even specifically mention Udren in the FCEUA count. Glover's relation-back theory to overcome the untimeliness of her pleading should, therefore, be rejected.

Glover also urges that the FDCPA statute of limitations has been tolled by certain stays of these proceedings entered by this Court in accordance with the

statutory scheme of the FIRREA.  The relevant chronology is as follows:

- January 4, 2008 - Glover's FDCPA claim against Udren arises;

- October 24, 2008 – Order granting FDIC's motion for a 90-day stay;

- January 22, 2009 – 90-day stay expires; FDIC filed motion for a stay of proceedings pending exhaustion of mandatory claims process;

- March 20, 2009 - Memorandum and Order granting Motion to Stay filed;

- June 15, 2009 – District Court Order concluding that, after review of this Court's Opinion and Order, and upon consideration of the objections and responses filed, no part of the Order granting the stay was clearly erroneous or contrary to law;

- September 14, 2009 – FDIC denies Glover's administrative claim;

- October 14, 2009 – Glover files amended complaint including FDCPA allegation against Udren.

As this Court calculates, the two stays entered in this

case, 90 days between October 24, 2008 and January 22, 2009, and the time between the this Court's March 20, 2009 Order granting the FDIC's motion for a stay and the September 14, 2009 FDIC denial of Glover's administrative claim, totaling 178 days, would extend the time for Glover to file the FDCPA claim for 268 days.3  Therefore, the deadline for filing the FDCPA claim would be 268 days from January 4, 2009, when the statute of limitations would have normally expired, or September 29, 2009. The complaint was not filed until October 14, 2009; therefore the FDCPA claim is time-barred.

Glover's final argument against application of a time bar is that Udren continued its litigation of the underlying mortgage foreclosure action in both state and federal court during the applicable post January 4, 2008 time period.  This argument is meritless.  First, Glover acknowledges that the last date that Udren manifested an intent to proceed with the foreclosure action in state court was July 5, 2006, a year and one-half before the cause of action even arose.  Second, Glover's suggestion that Udren's pleadings filed this matter in

---

3    While the stay of proceedings pending exhaustion of the administrative proceedings did not technically go into effect until the District Court's June 15, 2009 order denying Glover's objections, the duration of the stay will be calculated generously to Glover from this Court's March 20, 2009 Memorandum and Order.

defense of allegations leveled it equate to illegal debt collection activities, including a subsection of the FDCPA not even alleged in her complaint, is frivolous.

For this reason, the Court recommends that Glover's FDCPA allegations against Udren (counts twelve and thirteen) be dismissed with prejudice.

### 2. State Law Claims [4]

### Fair Credit Extension Uniformity Act

In count fourteen of her second amended complaint, Glover asserts the Udren violated the FCEUA by virtue of its violation of the FDCPA. See 73 P.S. § 2270.4(a)(debt collector's violation of FDCPA is considered unfair or deceptive act or practice under FCEUA). The statute of limitations for FCEUA claims is two years. 73 P.S. § 2270.5(b).

The Court need not delve into the thorny issue of whether the FCEUA count, with its longer limitations statute, would survive after a conclusion that the underlying FDCPA claim

---

[4] In a footnote in its brief, Udren submits that, in the event that the FDCPA count is dismissed, this Court should decline to exercise supplemental jurisdiction over the remaining state law claims. The invitation is declined. In addition to 28 U.S.C. § 1331 federal question jurisdiction, this Court also has original jurisdiction over this matter under 28 U.S.C. § 1332 based upon diversity of citizenship and amount in controversy. Udren so acknowledged in the notice of removal filed on July 14, 2008 (Doc. #1, Exhibit E).

is time-barred, because Glover may not pursue a FCEUA action against Udren for an independent reason.

The definitional section of the FCEUA, informs that the word "debt" does not include "money which is owed or alleged to be owed as a result of a loan secured by a purchase money mortgage on real estate." 73 P.S. § 2270.3. The statute does not specifically define "purchase money mortgage."

It is undisputed that Glover borrowed money from WalMu to acquire title to a property at 709 Henry Street, Clairton Pennsylvania. Sec. Am. Compl., Ex. B. The mortgage agreement, attached to the second amended complaint, contains the statement: "If any of the debt secured by this [Mortgage] is lent to Borrower to acquire title to the property, this [Mortgage] shall be a purchase money mortgage." Id. at Ex. B, ¶ 22. Despite this language, in a footnote, Glover restates her prior argument that her loan is not a purchase money mortgage as that term has been described in common law, *i.e.*, a purchase money mortgage results when the vendor of the property accepted a mortgage from the property buyer as part of the purchase price.

The goal in interpreting statutes is to determine and give effect to the legislative intent. 1 Pa.C.S. § 1921. Statutory

language is construed according to its "common and approved usage," but "technical" phrases are "construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S. § 1903(a). Also, if the words of a statute are not explicit, the General Assembly's intent can be ascertained through a number of factors, including, examination of other statutes on similar subjects. 1 Pa.C.S. § 1921(c)(5); <u>In re 2003 General Election for Office of Prothonotary</u>, 578 Pa. 3, 14, 849 A.2d 230, 236 - 37 (2004). <u>See also General Electric Environmental Services, Inc. v. Envirotech Corporation</u>, 763 F.Supp. 113, 119 (M.D.Pa. 1991) (under Pennsylvania law, courts may consider interpretation of similar statutes to interpret Pennsylvania statute).

The term "purchase money mortgage" is not one within the common parlance; therefore, rules of construction regarding technical terms are applicable. As such, the Court looks to whether the term has been given a particular meaning. In <u>United States v. Davoli</u>, Civil Action No. 04-1035, 2006 WL 4491443, * at 4 (W.D. Pa. November 22, 2006), this Court stated that, in Pennsylvania, a purchase money mortgage is one:

> (i) taken by the seller of the mortgaged property to secure the payment of all or part of the purchase price; or

> (ii) taken by a mortgagee other than the
> seller to secure the repayment of money actually
> advanced by such person to or on behalf of the
> mortgagor at the time the mortgagor acquires title
> to the property and used by the mortgagor at that
> time to pay all or part of the purchase price,
> except that a mortgage other than to the seller of
> the property shall not be a purchase money
> mortgage within the meaning of this section unless
> expressly stated so to be.

42 Pa.C.S. § 8141 (1)(i), (ii).

While this definition involved analysis of Pennsylvania's Lien Priority Law, it clearly represents legislative intent on the meaning of the term "purchase money mortgage." The Court is not aware that the legislature has ascribed a different meaning to the phrase and cannot perceive of a reason why the term should be construed differently in the context of the FCEUA. Accordingly, because the debt at issue here falls within the definition of a purchase money mortgage and the mortgage specifically declares it as this type of mortgage, the FCEUA does not apply here. Pearson v. LaSalle Bank, Civil Action No. 08-2306, 2009 WL 1636037, at *4 (E.D.Pa. June 9, 2009)(considering mortgage note and deed as proof that underlying debt was a purchase money mortgage and therefore excluded from FCEUA).

For this reason, it is recommended that Udren's motion to dismiss the FCEAU allegation (count fourteen) be granted with

prejudice.

Loan Interest and Protection Law

Pennsylvania's Loan Interest and Protection Law, 41 P.S. § 101 ("LIPL") *et seq.*, sets forth the legal rate of interest in Pennsylvania and details exceptions to that rate. The purpose of the law is to protect citizens "from being exploited at the hands of unscrupulous individuals seeking to circumvent the law at the expense of unsuspecting borrowers who may have no other avenue to secure financial backing . . . ." Smith v. Mitchell, 616 A.2d 17, 20 (Pa. Super. 1992).

In count sixteen of the second amended complaint, Glover contends that Udren violated the provisions of the LIPL which provide for a 30-day right to cure a default after a notice of intention to foreclose has been presented to a debtor and limit the type and amount of attorneys' fees a residential mortgage lender shall contract for or receive asserts that these allegedly unauthorized attorneys' fees and costs are recoverable under 41 P.S. §§ 501 and 502. Specifically, Glover complains that Udren charged or collected foreclosure-related: 1) attorneys' fees and costs in excess of $50 before the expiration of the 30-day right to cure in violation of 41 P.S. § 404; 2) attorneys' fees in excess of $50 after the thirty-day right to cure, but

18

before a foreclosure complaint was filed in violation of 41 P.S. § 406(3); 3) attorneys' fees that were charged or collected before they were actually incurred in violation of 41 P.S. § 406; 4) attorneys' fees that were percentage-fee based in violation of 41 P.S. § 406(2) which authorizes only reasonable fees; [5] and, 5) fees (pre and/or post the foreclosure judgment) that were not awarded by a court.

Udren urges that the LIPL allegations should be dismissed because such claims are cognizable only against lenders and because no monies were paid by Glover to Udren.[6]

---

[5]   41 P.S. § 406 reads:

§ 406. Attorney's fees payable

With regard to residential mortgages, no residential mortgage lender shall contract for or receive attorney's fees from a residential mortgage debtor except as follows:

(1) Reasonable fees for services included in actual settlement costs.

(2) Upon commencement of foreclosure or other legal action with respect to a residential mortgage, attorney's fees which are reasonable and actually incurred by the residential mortgage lender may be charged to the residential mortgage debtor.

(3) Prior to commencement of foreclosure or other legal action attorneys' fees which are reasonable and actually incurred not in excess of fifty dollars ($50) provided that no attorneys' fees may be charged for legal expenses incurred prior to or during the thirty-day notice period provided in section 403 of this act.

[6]   Udren also incorporates by reference its prior

Udren's first argument is that the right to recover statutory penalties for allegedly excessive charges may be asserted only by the borrower against the lender. Udren's legal authority for this position is <u>Weiner v. Bank of King of Prussia</u>, 358 F.Supp. 684, 691 (E.D. Pa. 1973). In <u>Weiner</u>, the court construed a section of a prior codification of the LIPL, namely 41 P.S. § 4, related to debtor's actions to recoup excessive interest paid to creditors and, determined that a "borrower may enforce this provision only against the creditor from whom he contracted." <u>Id</u>. at 691. The question of whether <u>Weiner</u> controls here presents an issue of statutory construction.

Under the statutory scheme of the LIPL, Section 404 provides the debtor has a right to cure the default after receiving the notice of intent to foreclose from the residential mortgage lender. 41 P.S. § 404. Section 406 then details the type and amount of attorney's fees that a residential mortgage lender shall contract for or receive with regard to residential mortgages. A "residential mortgage lender" is defined as: "any person who lends money or extends or grants credit and obtains a residential mortgage to assure payment of the debt. . . . " 41

argument that the LIPL claims are preempted by the National Housing Act and the National Bank Act which was previously addressed and rejected. <u>See</u> Report and Recommendation filed June 3, 2010 (Doc. #107).

P.S. § 101. The language of these provisions imposes duties on lenders, not attorneys.

Sections 501 and 502 then describe recourse for debtors who have paid excessive interest or charges. Under current § 501:

> ### § 501. Excessive interest need not be paid
>
> When a rate of interest for the loan or use of money, exceeding that provided by this act or otherwise by law shall have been reserved or contracted for, the borrower or debtor shall not be required to pay to the creditor the excess over such maximum interest rate and it shall be lawful for such borrower or debtor, at his option, to retain and deduct such excess from the amount of such debt providing the borrower or debtor gives notice of the asserted excess to the creditor.

This section essentially recodifies a portion of 41 P.S. §4, repealed, 1974, January 30, P.L.13, No. 6, § 603, the section analyzed by the Weiner court. The significant difference between the two versions is that 41 P.S. § 4 included language setting a time limit to bring an action to recover back any excess interest, to wit:

> [I]n all cases where any borrower or debtor shall heretofore or hereafter have voluntarily paid the whole debt of sum loaned together with interest exceeding the lawful rate, no action to recover back any such excess shall be sustained in any court of this Commonwealth, unless the same shall

> > have been commenced within six months from
> > and after the time of such payment . . . .

41 P.S. § 4.

The current version of the statute moves old section 4's language regarding commencement of a suit to section 41 P. S. § 502. In addition to establishing new time limits to bring an action under the LIPL, section 502 provides for a treble-damage recovery of both excess interest and charges against any person who has collected such excess or charges:

> A person who has paid a rate of interest
> . . . in excess of that provided by this act
> . . . or has paid charges prohibited or in
> excess of those allowed by this act . . .
> may recover triple the amount of such excess
> interest or charges in a suit of law against
> the **person** who has collected such excess . .
> . charges. Provided, That no action to
> recover such excess shall be sustained in
> any court of this Commonwealth unless the
> same shall have been commenced within four
> years from and after the time of such
> payment. Recovery of triple the amount of
> such excess interest or charges, but not the
> actual amount of such excess interest or
> charges, shall be limited to a four-year
> period of the contract.

41 P.S. § 502 (emphasis added). The statute defines "person" as "an individual, corporation, business trust, estate trust, partnership or association or any other legal entity, and shall include but not be limited to residential mortgage lenders." 41 P.S. § 101.

While no Pennsylvania legislative history accompanies Section 502, see Matter of Grigsby, 127 B.R. 759, 762 (E.D.Pa. 1991), "[w]here words of a later statute differ from those of a previous one on the same subject, they presumably are intended to have a different construction." CSC Enterprises, Inc. v. State Police, Bureau of Liquor Control Enforcement, 782 A.2d 57, 63 (Pa. Commw. Ct. 2001)(citing Walton Estate, 409 Pa. 225, 186 A.2d 32 (1962)). With this precept of statutory construction in mind, the Court must ascribe significance to the language of § 502 which specifically provides for recovery of excessive charges against any **person** collecting such charges, wording not included in prior 41 P.S. § 4. If the legislature intended to limit recovery under § 502 against only residential mortgage lenders, as Udren suggests, it would not have utilized the word "person", a term specifically defined by the statute as "not . . . limited to residential mortgage lenders." 41 P.S. § 101. Similarly, the more expansive language of section 502 casts significant doubt on the rote application of Weiner's holding limiting recovery for a LIPL violation against only creditors. The impact of the Weiner holding is also diminished since the borrower in that case was seeking to recover damages for excessive interest charges, and not attorneys' fees.

There is admittedly scant precedent that claims under the LIPL can be asserted against attorneys who have received fees charged in connection with residential mortgage transactions and the Court's research has uncovered only one case which suggests, but does not discuss, that a law firm can be sued under the Act. In _Flores v. Shapiro & Kreisman_, 246 F. Supp. 2d. 427 (E.D Pa. 2002), a plaintiff was the subject of collection efforts by a mortgage company which had forwarded the plaintiff's account to the law firm for collection. The debtor sued the law firm, its partners, and the partners' debt collection business alleging that the defendants violated state and federal laws protecting consumers from unfair business or debt collection practices. Relevant here, the plaintiff asserted that the defendants violated the LIPL by attempting to collect attorneys' fees in excess of $50 before the filing of a foreclosure complaint and by actually collecting fees in excess of $50 after the action was filed, even though the fees were incurred pre-foreclosure. The complaint, however, alleged only that the plaintiff paid the fees after the foreclosure.

The issue before the _Flores_ court was whether "after foreclosure commenced, it was permissible for the defendants to contract for or receive fees in excess of $50 that were incurred

pre-foreclosure." Id. at 430. The court reviewed 41 P.S. § 406 concerning permissible attorneys' fees, and without comment upon whether such an action to recover attorney's costs could be levied against the law firm debt collector, as opposed to the creditor, granted the law firm's motion to dismiss the LIPL count because the fees charged were allowable under the Act. While the issue of whether the law firm could be sued under the LIPL was not addressed in Flores, the Court notes it for the proposition that a law firm engaged in debt collection activity can face liability under the LIPL for collection of unauthorized attorneys' fees.

Given the rules of statutory construction and the possibility intimated by the Flores decision that LIPL claims are cognizable against attorneys acting as debt collectors, the Court, at this stage, cannot credit Udren's argument that the right to recover statutory penalties for a violation of the LIPL may be asserted only against the creditor.

Udren also argues that the LIPL claim fails because Glover agreed to pay the subject attorneys' fees as part of the negotiation culminating in the loan modification agreement with Wells Fargo and that Wells Fargo, and not Udren, collected the charges and fees under scrutiny. Udren also asserts that the types of attorneys' fees alleged to have been paid are

permissible under the LIPL.

The facts alleged in the second amended complaint concerning the collection of attorney's fees are as follows: Between March and April, 2006, prior to the filing of the mortgage foreclosure complaint, an attorney with Udren Law Offices called Glover and informed her that she must pay $1700 for missed loan payments and attorney's fees and costs totaling approximately $1697. Sec. Am. Compl. ¶ 17. Shortly thereafter, the foreclosure complaint was filed which included $1,250.00 in "Attorney's Fees (anticipated and actual to 5% of principal)" in its calculation of the amount owed. Id. at ¶ 19. Subsequently, on January 4, 2008, Wells Fargo and Glover entered into a loan modification agreement. The portion of the document breaking down the amount due under the agreement included $1571.02 for "Corp Recov/Title/Mod Fees/Atty/FC/BPO/Appraisal." Id. at Ex. R. Glover made payments to Wells Fargo under the loan modification agreement. Id. at ¶ 56.

These facts, at least in some respects, state a viable LIPL action against Udren. As for the oral demand prior to foreclosure and the listing of the due and owing attorneys' fees in the foreclosure complaint, such activity does not give rise to a claim under the LIPL. See Waye v. First Citizen's National

26

Bank, 846 F. Supp. 310, 319 (M.D. Pa. 1994)(cause of action against lender for excessive interest exists only if interest actually paid, not merely demanded without success).

The facts pled concerning the attorneys' fees paid pursuant to the loan modification agreement, however, state a cognizable claim at this stage of the proceeding. First, as already discussed, the statute has been construed to permit recovery against any person who collected excessive charges. Therefore, the fact that the charges at issue emanated from the loan modification agreement between Wells Fargo and Glover does not relieve Udren from possible LIPL liability. Even if Wells Fargo actually collected the funds from Glover, the complaint alleges that Udren, in turn, received the allegedly illegal amounts. Sec. Am Compl. § 59.

Second, it is impossible to determine from the face of the loan modification agreement if the attorneys' fees met the section 406(2) requirement that limits fees to those which are "reasonable" and "actually incurred." Since it is possible that the attorney's fees encompassed in the loan modification agreement might not be in conformity with 41 P.S. § 406, it cannot be said the LIPL claim against Udren is frivolous in this regard and it is recommended that the motion to dismiss the LIPL count be

denied.

### 4. Unfair Trade Practices and Consumer Protection Law

In count seventeen, Glover avers that Udren violated the UTPCPL by misrepresenting the amount she owed. Glover specifically asserts that Udren violated provisions of the UTPCPL prohibiting:

> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
> . . .
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201-2(v), (xxi).

Udren argues that this count should be dismissed because there was no transaction dealing with goods and services between it and Glover.

A private individual pursuing a UTPCPL cause of action must first demonstrate: 1) that he or she is a purchaser or lessee; 2) that the transaction is dealing with "goods or services"; 3) that the good or service was primarily for personal, family, or household purposes; and 4) that he or she

suffered damages arising from the purchase or lease of goods or services. 73 P.S. § 201-9.2

The statute is to be construed broadly to effectuate its general intent to eradicate fraudulent business practices. Agilori v. Metropolitan Life Insurance Company, 879 A.2d 315, 318, 2005 PA Super 253 (Pa. Super. 2005). Consequently, the Pennsylvania Superior Court has rejected the requirement of strict privity of contract before a claim can be brought under the statute. See Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc., 574 A.2d 641, 645-56 (Pa. Super. 1990) (declining to require strict technical privity onto silent statute, especially since no such restriction applies in fraud cases); see also Katz v. Aetna Casualty and Surety Company, 972 F.2d 53, 57 (3d Cir. 1992) (strict privity is not always an element of a UTPCPL private cause of action).

Glover's allegations that Udren misrepresented the amount of attorney's fees due and that she paid those amounts are sufficient to indicate, at this stage, that privity should be extended to permit litigation of the UTPCPL claim against the law firm. For this reason, it is recommended that the motion to dismiss the UTPCPL claim be denied.

5.) Liability of Mark Udren

The sole named reference to Mark Udren in the second amended complaint identifies him as a party. Sec. Am. Compl. ¶ 6. In that paragraph, Mark Udren is described as an attorney and partner/owner/principal of Udren Law offices who, in his role as a debt collector, has filed foreclosure actions in Pennsylvania. Citing the fact that there is not a single specific allegation against Mark Udren, Udren asserts that the complaint must be dismissed entirely as to him.

Glover's argument against dismissal of Mark Udren, relegated to a footnote in her brief, appears to claim that Mark Udren remains a viable party in this lawsuit by virtue of Pennsylvania law concerning liability of partners in Pennsylvania partnerships.

Without comment on whether Pennsylvania law applies to New Jersey law partnerships, the authority cited by Glover does not support her contention that Mark Udren should remain in this litigation. Under Pennsylvania partnership law, a partnership is liable for the wrongful acts of a partner, see 15 Pa.C.S. § 8325, and all partners are jointly and severally liable for actions charged to the partnership based on the wrongdoing of a partner. 15 Pa.C.S. § 8387. Glover, however, has failed to allege any wrongdoing by Mark Udren; therefore, it is recommended that the

motion to dismiss the second amended complaint as to this defendant be granted with prejudice.

D. Conclusion

For the reasons stated, it is respectfully recommended that the district court dismiss with prejudice Fair Debt Collection Practices Act claim (counts twelve and thirteen) and Fair Credit Extension Uniformity Act (count fourteen) as to Udren Law Offices. It is also respectfully recommended that the motion to dismiss the Loan Interest Protection Law claim (count sixteen) and the Unfair Trade Practices and Consumer Protection Law (count seventeen) be denied as to Udren Law Offices. Finally, it is recommended that the motion to dismiss as to Mark Udren be granted in its entirety (Doc. # 167). Within the time limits set forth in the attached notice of electronic filing, any party may serve and file written objections to the Report and Recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of the objections to respond thereto. Failure to file timely objections may constitute waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
Robert C. Mitchell
United States Magistrate Judge

Dated: March 14, 2011